IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

SHARON L. MAY,                          )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )       Case No.
                                        )       12-1026-CV-W-REL-SSA
CAROLYN W. COLVIN, Acting               )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Sharon May seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Titles II and XVI of the

Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) determining that

plaintiff's testimony was not credible, (2) in failing to assess a proper residual functional

capacity, and (3) in failing to apply the Medical-Vocational Guidelines. I find that the

substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's is not

disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision

of the Commissioner will be affirmed.

I.      BACKGROUND

        On January 19, 2010, plaintiff applied for disability benefits alleging that she had been

disabled since January 15, 2010. Plaintiff's disability stems from a vision impairment caused

by macular degeneration. Plaintiff's application was denied on March 19, 2010. On June 2,

2011, a hearing was held before an Administrative Law Judge. On June 24, 2011, the ALJ

found that plaintiff was not under a "disability" as defined in the Act. On June 19, 2012, the

Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands

as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

    Yes = not disabled.
    No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

    Yes = disabled.
    No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

    No = not disabled.
    Yes = go to next step where burden shifts to Commissioner.

5.  Does the impairment prevent the claimant from doing any other work?

    Yes = disabled.
    No = not disabled.

Case 4:12-cv-01026-REL   Document 14   Filed 04/19/13   Page 3 of 23

## IV.     THE RECORD

The record consists of the testimony of plaintiff, medical expert Stephen Bowen, Jr.,

M.D., and vocational expert Amy Salva, in addition to documentary evidence admitted at the

hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1969 through 2010,

shown in actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|------|-----------------|------------------|
| 1969 | $ 1,263.06      | $ 8,858.28       |
| 1970 | 4,110.66        | 27,466.44        |
| 1971 | 4,476.02        | 28,476.82        |
| 1972 | 4,542.91        | 26,322.72        |
| 1973 | 4,376.15        | 23,863.35        |
| 1974 | 5,375.61        | 27,668.70        |
| 1975 | 6,046.46        | 28,957.54        |
| 1976 | 5,671.58        | 25,408.89        |
| 1977 | 1,328.92        | 5,616.97         |
| 1978 | 3,331.53        | 13,045.50        |
| 1979 | 6,006.07        | 21,626.52        |
| 1980 | 10,040.92       | 33,167.58        |
| 1981 | 9,792.38        | 29,388.28        |
| 1982 | 9,4562.60       | 26,888.29        |
| 1983 | 10,290.21       | 27,911.20        |
| 1984 | 12,220.89       | 31,307.59        |
| 1985 | 11,934.29       | 29,324.01        |
| 1986 | 14,178.11       | 33,833.15        |
| 1987 | 15,590.38       | 34,972.87        |
| 1988 | 15,477.77       | 33,090.51        |
| 1989 | 11,951.82       | 24,579.06        |
| 1990 | 13,989.54       | 27,499.42        |
| 1991 | 15,108.03       | 28,631.09        |
| 1992 | 16,350.71       | 29,467.79        |
| 1993 | 11,943.68       | 21,341.75        |
| 1994 | 13,365.58       | 23,258.26        |
| 1995 | 17,130.80       | 28,661.49        |

Case 4:12-cv-01026-REL   Document 14   Filed 04/19/13   Page 4 of 23

| | | |
|---|---|---|
| 1996 | 16,467.39 | 26,266.95 |
| 1997 | 16,976.29 | 25,585.74 |
| 1998 | 17,600.35 | 25,206.99 |
| 1999 | 20,007.78 | 27,142.28 |
| 2000 | 18,302.92 | 23,528.37 |
| 2001 | 20,715.25 | 26,008.94 |
| 2002 | 22,837.30 | 28,388.56 |
| 2003 | 25,870.90 | 31,392.18 |
| 2004 | 27,366.04 | 31,731.29 |
| 2005 | 27,710.76 | 30,996.81 |
| 2006 | 28,202.00 | 30,160.06 |
| 2007 | 28,624.61 | 29,283.09 |
| 2008 | 28,948.09 | 28,948.09 |
| 2009 | 31,576.54 | 31,576.54 |
| 2010 | 0.00 | 0.00 |

(Tr. at 135-136).

## Function Report

In a Function Report dated February 13, 2010, plaintiff reported that she lives alone in an apartment (Tr. at 171-178). She described her daily activities as follows:

> Bath, make up (with magnified mirror) hair, feed cat, open blinds, drive to work. At work collect work to process, lunch, continue processing work til time to leave. At home change clothes, check personal mail, check cat, turn on TV, try to de-stress and unwind. Day started about 5:30 AM ended about 11:00 PM. Not working now, last day 1/15/10. Now up to about midnight or 1 AM and up around 10 AM or 11 AM unless going to church or an appointment then up earlier to bath etc. Generally trying to de-clutter & reorganize now that I have time.

When asked what she was able to do before her condition, she indicated that she needs more light for everything and she has found that driving at night, in the snow and in fog are more difficult. "Finding some paperwork - companies going to smaller type" and she needs larger type to read. Plaintiff is careful when she reads instruction on foods. She prepares her own meals and sometimes uses a stove top. She prepares meals at least twice a day and sometimes uses a magnifier to see instructions. She is able to vacuum, do dishes, clean all of her rooms, and do laundry. She goes to church weekly. When she goes out, she is able to drive and she goes out alone. She is able to shop in stores for groceries, personal products, and

5

cleaning products. She can pay bills, count change, handle a savings account, and use a checkbook or money orders. Plaintiff watches television daily. She gets on her computer two or three times a week.

Plaintiff's condition affects her ability to see and climb stairs -- her depth perception makes going up stairs difficult. Her condition does not affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, remember, complete tasks, concentrate, understand, follow instructions, use her hands or get along with others. Plaintiff finishes what she starts and follows spoken instructions well. She follows written instructions "generally well as long as they are understandable." She handles stress well. Plaintiff wrote, "Right now I can still drive, but parking and I found this past Christmas season the snow even creates a great challenge like the darkness at night. . . . I imagine that it would be difficult with my background to have a job with little to no reading. . . . The computer work was more convenient since the size of the font (reading) can be enlarged. My eyes did/do tire out and would hurt by the afternoon from all the reading (paper work)."

### Missouri Supplemental Questionnaire

In a Missouri Supplemental Questionnaire dated February 13, 2010, plaintiff reported that she plays games or otherwise reads on a computer for two to three hours at a time (Tr. at 180). She has a valid driver's license and is able to drive.

### B.    SUMMARY OF MEDICAL RECORDS

On February 18, 2009, plaintiff saw Gregory Fox, M.D., a surgeon at Retina Associates (Tr. at 216-219). She said lines appeared wavy constantly. Her vision was as measured at $20/125^1$ for the right eye and $20/40^{+2}$ for the left eye.[2] Dr. Fox diagnosed age-related macular

---

[1]The Snellen eye chart has a series of letters or letters and numbers, with the largest at the top. As the person being tested reads down the chart, the letters gradually become smaller. The Snellen fractions, 20/20, 20/30, etc., are measures of sharpness of sight. They relate to

6

degeneration[3] with a blind spot and scarring in her right eye. He indicated her left eye had no swelling and was improved, while her right eye was unchanged.

On March 18, 2009, plaintiff saw Dr. Fox (Tr. at 220-222). "Pt states thinks it's ok but she uses her eyes a lot at work and they get tired a lot. . . Pt states not much change." Vision was measured at 20/125 in the right eye and 20/30$^{-1}$ in the left. Plaintiff's condition was unchanged.

On June 10, 2009, plaintiff saw Dr. Fox (Tr. at 223-225). Plaintiff reported that she was "doing about the same" but that cloudy, hazy weather "messed" with her eyes. Vision was 20/125$^{-1}$ in the right eye and 20/30$^{+1}$ in the left. Eyelids were noted to be droopy. The diagnoses remained the same and her condition was stable with no new swelling.

Six months later, on December 9, 2009, plaintiff saw Dr. Fox (Tr. at 226-228). Plaintiff reported her visual acuity felt weaker and her depth perception was decreased. Her eyes felt tired. Vision was 20/160 in the right eye and 20/25$^{+2}$ in the left. Her eyelid was drooping

---

the ability to identify small letters with high contrast at a specified distance. They give no information about seeing larger objects and objects with poor contrast (such as steps and curbs); it also does not inform us as to whether or not meaning is obtained from visual input, how much effort is needed to see clearly or singly, and whether or not vision is less efficient when using both eyes as opposed to each eye individually. In short, visual acuity measures only the smallest detail we can see; it does not represent the quality of vision in general. August Colenbrander, M.D. (Smith-Kettlewell Eye research Institute and California Pacific Medical Center) offers a good explanation of acuity measurement. He says: "If a subject needs letters (or symbols) that are twice as large or twice as close as those that can just be seen by a standard eye, visual acuity is said to be 1/2 (or an equivalent fractional value, such as 20/40, 6/12, etc.). If the magnification need is 5x, visual acuity is 1/5 (20/100, 6/30, etc.), and so on."

[2]All visual measurements from Dr. Fox's records are with corrective lenses ("cc") unless otherwise noted.

[3]Age-related macular degeneration gradually destroys the macula, the part of the eye that provides sharp, central vision needed for seeing objects clearly.

7

(ptosis).  There were new SRH (submacular hemorrhages) with mild leakage so Lucentis was restarted.

On January 13, 2010, plaintiff saw Dr. Fox (Tr. at 229-231).  "Terminating employment in 1 week - considering disability."  Plaintiff's condition was unchanged per her report.  Drooping eyelid was again noted.  Plaintiff's vision was $20/125^{-1}$ in the right eye and 20/25 in the left.  Dr. Fox noted that plaintiff's right eye was improving and her left eye was unchanged.

Two days later -- January 15, 2010 -- is plaintiff's alleged onset date.

On February 24, 2010, plaintiff saw Dr. Fox (Tr. at 236-238).  "Pt c/o [complains of] spot being more elongated" since her last visit.  She was having some distortions with stairs but "not affecting pt unless with stairs. . . .  Pt stopped working b/c of vision affecting work."  Her vision was 20/160 in the right eye and $20/30^{-2}$ in the left.  Plaintiff's right cornea was cloudy.  Plaintiff's macular degeneration was noted to be stable and unchanged, and the plan was to continue monitoring her condition.

On May 19, 2010, plaintiff saw Dr. Fox (Tr. at 233-235).  She was using her eye drops more and felt she had decreased distance sight over the last three months.  Her vision was measured at 20/200 in the right eye and 20/30 in the left.  Gross visual field exam showed a partial blind spot.  Plaintiff's condition was stable.

On September 15, 2010, plaintiff saw Dr. Fox and reported worsening depth perception (Tr. at 245-247).  "This eye gets in my way so I close it."  She saw shadows on the eye chart.  The previous week she had equilibrium issues but that was connected with a sinus problem.  Her vision was $20/200^{+1}$ on the right eye and 20/25 in the left.  Plaintiff's condition was essentially unchanged and monitoring would be continued.

8

On November 2, 2010, plaintiff saw John Taylor, M.D., at Discover Vision Centers for a consultative evaluation for the State disability determination services (Tr. at 239-241). Plaintiff was noted to have a history of macular degeneration and had undergone PDT (photodynamic therapy)[4] and Lucentis injections in the right eye with Dr. Fox. Her left eye had dry age related macular degeneration.

Plaintiff was noted to have distortion in both eyes. Her vision was 20/200 in the right eye and 20/40 in the left. The impression was cataract,[5] nuclear sclerosis[6] and macular degeneration, in both eyes.

On November 29, 2010, plaintiff saw Tisha Anyanike, M.D., at Swope Health concerning menopausal issues and was noted to be obese and had elevated blood pressure (151/84) (Tr. at 253-254).

On December 21, 2010, plaintiff saw Dr. Anyanike at Swope Health for a follow up (Tr. at 251-252). Her blood pressure was 172/90, she was 275 pounds and 5'2" tall. Her

---

[4]In this treatment procedure, the doctor injects Visudyne into the patient's arm, then activates the drug as it passes through the retinal blood vessels by shining a low-energy laser beam into the patient's eye. Visudyne is activated by the laser light, which produces a chemical reaction that destroys abnormal blood vessels.

[5]"A cataract is a clouding of the normally clear lens of your eye. For people who have cataracts, seeing through cloudy lenses is a bit like looking through a frosty or fogged-up window. Clouded vision caused by cataracts can make it more difficult to read, drive a car -- especially at night -- or see the expression on a friend's face. Most cataracts develop slowly and don't disturb your eyesight early on. But with time, cataracts will eventually interfere with your vision. At first, stronger lighting and eyeglasses can help you deal with cataracts. But if impaired vision interferes with your usual activities, you might need cataract surgery. Fortunately, cataract surgery is generally a safe, effective procedure." http://www.mayoclinic.com/health/cataracts/DS00050

[6]This is the most common type of age-related cataract, caused primarily by the hardening and yellowing of the lens over time. "Nuclear" refers to the gradual clouding of the central portion of the lens, called the nucleus; "sclerotic" refers to the hardening, or sclerosis, of the lens nucleus.

physical exam was normal. She was diagnosed with hypertension for which Lisinopril was prescribed.

On March 23, 2011 (six months after her last visit), plaintiff saw Dr. Fox (Tr. at 261-264). Plaintiff said her depth perception was "still off and blurry." Her vision was $20/200^{-1}$ on the right and $20/30$ on the left. Dr. Fox noted that her condition was unchanged in both eyes (Tr. at 264).

On April 20, 2011, plaintiff saw Dr. Fox (Tr. at 266-267). "Low VA [visual acuity] unaware of any VA △ [changes] per patient." Plaintiff reported that spots "change shape." Her vision was $20/160^{-2}$ in the right eye and $20/30^{+1}$ in the left. Drooping eye lid was noted. Edema in the left eye was improving. Repeated Lucentis injections were given.

C.      SUMMARY OF TESTIMONY

During the June 2, 2011, hearing, plaintiff testified along with medical expert Stephen Bowen, Jr., M.D., and vocational expert Amy Salva.

1.      Plaintiff's testimony.

At the time of the hearing plaintiff was 59 years of age (Tr. at 34). She has a high school education (Tr. at 34).

Plaintiff stopped working in January 2010 (Tr. at 34). She received a "pretty good" retirement check when she left (Tr. at 34). She stopped working due to issues with vision (Tr. at 34). She had to use a magnifying glass to do her work and she was unable to do it timely (Tr. at 34). She worked with numbers and had to apply payments to patient accounts (Tr. at 35). She thought down the road her co-worker would end up carrying more of the load and that would be a problem (Tr. at 35). They would put the work in a pile and each did it, and the co-worker wound up doing more than plaintiff did (Tr. at 38). It took her a while, but she could do her work (Tr. at 38). Plaintiff had that job for ten years (Tr. at 35). Before that she

worked for another company in the accounting department (Tr. at 35). She worked there for two or three years and then the company went bankrupt (Tr. at 35).

Plaintiff periodically worked as a hair stylist but most of her past work has been office work (Tr. at 35). It has been 15 or 20 years since plaintiff worked as a hair stylist (Tr. at 36). She worked at Snip 'n Clip in Excelsior Springs part time in 2001 (Tr. at 36).

Plaintiff tried a part-time job in food service at the hospital after she left the clerical position (Tr. at 40). She did that for about a month (Tr. at 40). Plaintiff was unable to make sandwiches while reading the order or the menu (Tr. at 40). When she made the menu bigger, it got in the way (Tr. at 40). She was unable to see the "fill" line when making coffee (Tr. at 41). "[O]n the whole, I guess I'm just used to clerical work." (Tr. at 41).

Plaintiff's eyes get tired and sometimes hurt (Tr. at 38). She can do data entry for about an hour before she notices that her eyes are tired (Tr. at 38). Now that she's not working, her eyes get tired if she spends a while on the computer (Tr. at 38). If she does not have to do detailed work, "it doesn't seem to bother me as much." (Tr. at 39). Detailed work would be any kind of reading or sewing (Tr. at 40). Plaintiff uses a magnifying glass to read, and on the computer she can make the print larger so she does not tire out as fast (Tr. at 40).

Eye drops help keep her eyes from drying out (Tr. at 39). If plaintiff is watching television, she notices "when the day is half gone" that her eyes are tired (Tr. at 39). She never pays attention to how often she sits with her eyes closed -- "There has been like two or three times during the day. I will close my eyes because of that because they're tired." (Tr. at 39). She closes them for "maybe five minutes." (Tr. at 39).

Plaintiff's vision affects her "a little bit" at home (Tr. at 41). "Most of the stuff I'm doing around the house are big and general" (Tr. at 41). Plaintiff has a driver's license but

does not drive because she does not own a car (Tr. at 41). She cooks although mostly she uses a microwave because she lives alone (Tr. at 41).

## 2. Medical expert testimony.

Medical expert Stephen Bowen, Jr., M.D., testified at the request of the Administrative Law Judge. The only visual listing that applies in this case is 2.02 (Tr. at 30). Listings 2.03 and 2.04 require loss of "visual fields" and there are none in the record (Tr. at 30). Plaintiff does not equal listing 2.02 because it requires best correction to be 20/200 or less in the better eye, and plaintiff's better eye is 20/40 (Tr. at 30). According to the medical records, Dr. Bowen believes that plaintiff has macular degeneration in both eyes (Tr. at 30).

Plaintiff has peripheral depth perception, although it would not be good depth perception for fine objects (Tr. at 31). She would be able to locate objects in a room and decide whether they were close or far (Tr. at 32). She would have difficulty reading small print even with good correction, but she could get around that with magnification (Tr. at 32). Plaintiff's recent vision of 20/30 plus in the left eye is "pretty good central vision" (Tr. at 32). She would be able to see "very small" print with magnification but it would be hard for her (Tr. at 32).

If plaintiff were doing a lot of close work, there would times when she might be confused by very small print "as to whether it was an eight or a six" (Tr. at 33). Although that could be taken care of with magnification, it would cause her additional eye strain (Tr. at 33). In order to recover from eye strain, one should "look away and give your eyes a rest" (Tr. at 33).

## 3. Vocational expert testimony.

Vocational expert Amy Salva testified at the request of the Administrative Law Judge. The first hypothetical involved a person who can perform medium work but no unprotected heights or hazards, no depth perception, no reading fine print, no working on a ladder, rope or

12

scaffold, and no concentrated airborne irritants (Tr. at 43). The vocational expert testified that plaintiff could not perform her past relevant work but she could work as a Laundry Worker I, DOT 361.684-014, with 800 positions in the Kansas City area, 1,800 in Missouri, and 30,000 in the United States (Tr. at 44). She could work as a conference room attendant, DOT 358.677-014, with 75 positions in Kansas City, 300 in Missouri, and 40,000 in the United States (Tr. at 44). She could be a housekeeper, DOT 323.687-014, with 700 in Kansas City, 3,000 in Missouri, and 180,000 in the United States (Tr. at 44). The first position is medium, the other two are light (Tr. at 44). The cleaning position would require a person to be aware of the hazards of any chemicals used (Tr. at 45).

Plaintiff's counsel asked whether a locker room attendant would be required to read a "tiny little engraved key" to help someone put a key into a locker, and the vocational expert said, "It seems to me like it would be necessary," although the Dictionary of Occupational Titles does not list that as a requirement (Tr. at 45). A laundry worker sorts uniforms of different colors coming in from different places of employment (Tr. at 46). They are bundles coming in off the dock (Tr. at 46). The employees sort the uniforms, rugs, sheets and towels so they can be washed separately (Tr. at 46).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge George Bock entered his opinion on June 24, 2011 (Tr. at 15-21). Plaintiff's last insured date is December 31, 2014 (Tr. at 17).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 17).

Step two. Plaintiff suffers from macular degeneration of the right eye causing blindness and moderate obesity, which are severe impairments (Tr. at 17).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 18). The ALJ considered Listing 2.02 and considered plaintiff's obesity even though there is no specific listing for obesity (Tr. at 18).  The medical expert testified that plaintiff's impairments do not meet a listing, and plaintiff's counsel did not argue that her impairments meet a listing (Tr. at 18).

Step four.  Plaintiff's subjective complaints of disability are not credible (Tr. at 19).  She retains the residual functional capacity to perform medium work except she cannot work at unprotected heights or around hazards.  Her work cannot require depth perception or fine acuity where she has to read fine print.  She cannot climb ladders, ropes, or scaffolds and she cannot have concentrated exposure to airborne irritants (Tr. at 18).  With this residual functional capacity, plaintiff cannot perform her past relevant work as an accounts receivable/payable clerk (Tr. at 19).

Step five.  Plaintiff can perform other work available in significant numbers, such as medium Laundry Worker I, with 800 jobs in Kansas City, 1,800 in Missouri, and 130,000 in the country; light housekeeper, with 700 in Kansas City, 3,000 in Missouri, and 180,000 in the country; or locker room attendant, with 75 jobs in Kansas City, 300 in Missouri, and 40,000 in the country (Tr. at 20).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

The ALJ found Plaintiff not credible as to the intensity, persistence, and limiting effects of her symptoms.  The ALJ based this determination on Plaintiff's activities of daily living citing her ability to drive, take care of her cat, prepare meals, vacuum, wash dishes, clean, do laundry, and go to church.  The Plaintiff testified, however, she does not drive after dark, does not drive in the winter, has difficulty with on and off ramps, parking, reading street signs, and further, no longer owns a car.  As to eating, the meals she prepares are for her and typically consist of sandwiches and microwave foods for which she has to use more light and a magnifier to read the heating instructions.  Plaintiff reported as to cleaning, the area of her apartment is not very big. As to church attendance, Plaintiff does not go if there is bad weather.  She is unable to

14

participate in any evening activities. The ALJ has overstated the Plaintiff's ability to perform activities of daily living. . .

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to

15

relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

A summary of plaintiff's relevant testimony follows:

She stopped working due to issues with vision. She had to use a magnifying glass to do her work and she was unable to do it timely. Plaintiff periodically worked as a hair stylist but most of her past work has been office work. Plaintiff tried a part-time job in food service at the hospital after she left the clerical position. Plaintiff was unable to make sandwiches while reading the order or the menu. When she made the menu bigger, it got in the way. She was unable to see the "fill" line when making coffee. "[O]n the whole, I guess I'm just used to clerical work."

Plaintiff's eyes get tired and sometimes hurt. She can do data entry for about an hour before she notices that her eyes are tired. Now that she's not working, her eyes get tired if she spends a while on the computer. If she does not have to do detailed work, "it doesn't seem to bother me as much." Detailed work would be any kind of reading or sewing. Plaintiff uses a magnifying glass to read, and on the computer she can make the print larger so she does not tire out as fast.

Eye drops help keep her eyes from drying out. If plaintiff is watching television, she notices "when the day is half gone" that her eyes are tired. She never pays attention to how often she sits with her eyes closed -- "There has been like two or three times during the day. I will close my eyes because of that because they're tired." She closes them for "maybe five minutes."

Plaintiff's vision affects her "a little bit" at home. "Most of the stuff I'm doing around the house are big and general". Plaintiff has a driver's license but does not drive because she does not own a car. She cooks although mostly she uses a microwave because she lives alone.

The ALJ briefly discussed plaintiff's testimony and then wrote, "After careful consideration of the evidence, the undersigned finds that the claimant's statements concerning the intensity, persistence and limiting effects of her symptoms are not credible *to the extent they are inconsistent with the above residual functional capacity assessment.*" (Tr. at 19, emphasis added). The ALJ actually misquoted plaintiff's testimony,[7] i.e., he stated that she said

---

[7] Q. How often do you need to rest your eyes because they hurt from the strain?
A. It doesn't; well it takes a little while longer before detailed work because it took me like I said within an hour's time; I guess maybe when the day is half gone, then I feel it when I'm watching TV or whatever.
Q. How often do you just sit there with your eyes closed?
A. I don't know. I never really paid attention to that. There has been like two or three times during the day. I will close my eyes because of that because they're tired.
Q. And how long do you generally have to do that?

she has to "rest her eyes half the day" but what she actually said was that when she is watching television, she may have to close her eyes for five minutes "after half the day is gone." The reason the ALJ did not discuss plaintiff's credibility very much is that plaintiff's testimony actually supports a finding of "not disabled."

Plaintiff said that two or three times a day, she will close her eyes for maybe five minutes to rest them. She testified that if she does not have to do detailed work, her eyes do not bother her that much. At home most of what she does is "big stuff" rather than tasks requiring fine visual acuity, and at home doing this "big stuff" her vision only affects her "a little bit."

Even assuming that plaintiff's testimony is true,[8] the ALJ's finding of "not disabled" would still be supported by the record. Plaintiff has an excellent work record, but she testified that she has only done clerical work during her entire career and that's what she's used to -- i.e., she has not tried any other occupation besides spending one month working in food service which required reading menus and orders, tasks wholly different from the requirements of a laundry worker which the ALJ found plaintiff could do. Plaintiff has not indicated that she cannot do any job -- she has indicated that she cannot do clerical work: "I'm used to clerical work to begin with. . ." (Tr. at 40). "[B]ut on the whole, I guess I'm just used to clerical work." (Tr. at 41). "I imagine that it would be difficult with my background to have a job with little to no reading." (Tr. at 178).

Plaintiff's hobbies are watching television and getting on the computer, which indicates her eyes are not too painful to perform non-detailed work during the day. She spends two to

---

A. I don't know maybe five minutes. (Tr. at 39).

[8]And I note that plaintiff's arguments about her daily activities are irrelevant. Plaintiff no longer drives because she does not have a car, not because of her visual impairment. She does not do very much housework because her home is small, not because of any impairment. She cooks simple meals because she lives alone, not because of any impairment.

four hours at a time on her computer (Tr. at 197). She reported that she "sometimes" needs a magnifier to read instructions on boxes or some recipes (Tr. at 195). She tries to read labels when she shops for groceries at the store (Tr. at 196).

By contrast, a laundry worker sorts uniforms of different colors coming in from different places of employment. The employees sort the bundles of uniforms, rugs, sheets and towels so they can be washed separately. There is nothing about plaintiff's testimony which calls into doubt her ability to perform these duties.

## VII.   PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in failing "to link the RFC determination to the substantial evidence of record and include all of the limitations supported by the substantial evidence". Plaintiff argues that the ALJ erred in failing to take into consideration plaintiff's obesity.

A claimant's residual functional capacity is the most she can do despite the combined effect of her credible limitations. 20 C.F.R. §§ 404.1545 and 416.945. It is the claimant's burden to prove her residual functional capacity, and it is the ALJ's responsibility to determine the residual functional capacity based on all relevant evidence in the record, including medical evidence. Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."). Ultimately, it is up to the ALJ to weigh all the evidence. Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) ("It [is] the ALJ's task to resolve conflicts in the evidence.").

Obesity is considered "severe" when it significantly limits an individual's physical or mental ability to do basic work activities. See SSR 02-1p, Policy Interpretation, Sequential

Evaluation: Step 2, Severe Impairment, paragraph 6. The ALJ found plaintiff to have the "severe" impairment of obesity. The ALJ is required, then, to assess the effect obesity has on an individual's ability to perform routine movement and physical activity within the work environment. SSR 02-1p, paragraph 8. The ALJ is required to explain how he reached any conclusions on whether obesity caused any physical or mental limitations. SSR02-1p. "Obesity, in combination with other impairments must be considered when evaluating disability at the listings step and other steps of the sequential analysis." 64 Fed. Reg. 46,122, 46,123 (Aug. 24, 1999).

In this case, I find that the ALJ's determination that plaintiff's obesity is a severe impairment is not supported by the record. This precise issue was addressed by the court in Morrill v. Commissioner of SSA, 2011 WL 2669153 (D. Me., July 5, 2011):

> Morrill complains that the Judge erred by describing Morrill's obesity as severe without assigning any corresponding limitations at the residual functional capacity stage, or even discussing the question further. The Judge's treatment of the obesity issue can certainly be faulted. However, the Judge's limited consideration of the issue states that the only reason she described obesity as a severe condition was due to the fact that Morrill's body mass index "is classified as obese according to commonly accepted standards as determined by the Centers for Disease Control." That reasoning, in and of itself, is erroneous. A given body mass index does not require a finding that obesity results in severe impairment. Social Security Ruling 02–01p, 2000 WL 628049, at *4, 2002 SSR Lexis 1, * 12 ("There is no specific level of weight or BMI [Body Mass Index] that equates with a 'severe' or a 'not severe' impairment. Neither do descriptive terms for levels of obesity (e.g., 'severe,' 'extreme,' or 'morbid' obesity) establish whether obesity is or is not a 'severe' impairment for disability program purposes.").

> Morrill has the burden of proving not merely that obesity is a severe condition, in the abstract, but that obesity imposes a limitation on her ability to perform work-related activity. Morrill's evidence does not demonstrate that her physical residual functional capacity is limited by a severe physical impairment. Obesity could well impact mechanical back pain or knee pain, but the Judge found that these impairments were not "medically determinable." Morrill has not challenged that finding in her statement of errors. I am not moved to recommend reversal in the absence of sound argument addressed to that question, particularly where my own review of the record merely reveals complaints of intermittent pain that Morrill had treated with over-the-counter medication, a treating source opinion of an extreme nature that has no grounding in the treatment record, and consulting evaluations

19

finding that the medical records do not demonstrate any physical impairment at all. On this record, I find the alleged obesity-related error harmless.

Plaintiff went to see Dr. Anyanike on two occasions over a three-week period -- once for a symptom of menopause and the second time for a follow up on that issue. Dr. Anyanike did not diagnose obesity. On each visit, it was observed that plaintiff was obese. Plaintiff did not complain of obesity, no difficulties due to obesity were observed or recorded. One doctor observing that a patient is obese is not a basis for a finding by an ALJ that obesity is a severe impairment.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

> (a)  Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

> (b)  Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--

>> (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; . . .

There is no evidence whatsoever in this record that plaintiff's obesity significantly limits her ability to walk, stand, sit, lift, push, pull, reach, carry or handle. In fact in her Function Report plaintiff stated that her condition affects only her ability to see and climb stairs -- but it was her depth perception that affected her ability to climb stairs, not obesity. She reported that her condition does not affect her ability to lift, squat, bend, stand, reach, walk, sit, or kneel.

20

As the court in Morrill did, I conclude that the ALJ erred in finding that obesity is a severe impairment; however, because that does not affect the outcome of the case, it was harmless error.

## VIII. MEDICAL-VOCATIONAL GUIDELINES

Plaintiff argues that the ALJ erred in failing to apply the Medical-Vocational Guidelines because plaintiff was "seven months shy of being 60 years old," and also takes issue with the jobs the ALJ found plaintiff could perform.

At step five of the sequential evaluation process, the ALJ determines whether the claimant is able to do any work based on his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g) and 416.920(g). If the claimant can perform all, or substantially all, of the exertional demands at a given level of exertion based on his specific vocational profile, the Medical-Vocational Guidelines (Grids) direct a finding of "disabled" or "not disabled." 20 C.F.R. Pt. 404, Subpt. P, App. 2; SSR 83-11. If the Grids do not direct a finding, the burden of proof shifts to the Commissioner to demonstrate that other work exists in significant numbers in the national economy that the claimant can do. 20 C.F.R. §§ 404.1512(g), 404.156(c), 416.912(g), and 416.960(c). The Commissioner must produce vocational-expert testimony in order to meet this burden. Clark v. Chater, 75 F.3d 414, 418 (8th Cir. 1996).

As plaintiff had no physical (exertional) limitations, was 59 years of age ("closely approaching retirement age"), was a high-school graduate, and had skilled work experience, the Grids would direct a finding that she was not disabled. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 203.00. However, because the ALJ determined that her ability to perform all or substantially all of the requirements of medium level work was impeded by additional non-exertional limitations, the Grids did not direct a finding; and the ALJ had to consult a

21

vocational expert to determine whether jobs existed in the national economy for an individual with plaintiff's additional limitations. <u>Clark v. Chater</u>, 75 F.3d at 418; 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e). The vocational expert testified there were jobs available for a claimant with plaintiff's characteristics and residual functional capacity and provided several examples of representative jobs. The Commissioner's burden was, therefore, satisfied.

Plaintiff also suggests that the ALJ should have consulted the Grid rule for light work. The ALJ found that plaintiff was capable of medium work, and that finding is supported by substantial evidence.

Plaintiff also claims the vocational expert's identification of laundry worker was improper and did not sustain the Commissioner's burden to establish there were jobs available to plaintiff. Plaintiff argues the "Laundry Worker I" position was inconsistent with her residual functional capacity as assessed by the ALJ because there is some reading involved and some exposure to chemicals. Plaintiff points to no evidence this particular job would include exposure to chemicals and certainly not to "concentrated exposure to airborne irritants" which is what is precluded by the residual functional capacity. Likewise, the ALJ did not preclude all reading but only reading of "fine print." Finally, "Laundry Worker I" was just one example of a job fitting plaintiff's residual functional capacity; the vocational expert identified other jobs as well. The vocational expert's testimony appropriately suggested representative occupations that plaintiff would be able to perform, upon which the ALJ correctly relied, and that satisfied the Commissioner's burden.

Plaintiff appears to suggest that she would be limited to light work if she could not perform the job of Laundry Worker I because Laundry Worker I was the only medium job described by the vocational expert. However, this conclusion is faulty because the ALJ must determine the claimant's residual functional capacity before considering whether work exists.

22

The ALJ properly determined that based on plaintiff's age, education, work experience, and residual functional capacity, she was capable of making a successful adjustment to other work that exists in significant numbers in the national economy and was, therefore, not disabled.

## IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 18, 2013

23